**SCHIAN WALKER, P.L.C**.
3550 NORTH CENTRAL AVENUE, #1700
PHOENIX, ARIZONA 85012-2115
TELEPHONE: (602) 277-1501
FACSIMILE: (602) 297-9633
E-MAIL: ecfdocket@swazlaw.com
SCOTT R. GOLDBERG, #015082
CODY J. JESS, #020566
Attorneys for the Debtors

# UNITED STATES BANKRUPTCY COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| In re: | CHAPTER 11 |
| MCCALLISTER PROPERTIES, LLC, a Delaware limited liability company; CENTREPOINTE DEVELOPMENT- GLOBAL VISION INVESTMENT FUND LIMITED PARTNERSHIP, a Delaware limited partnership; CENTREPOINTE DEVELOPMENT INVESTMENT FUND GP, LLC, a Delaware limited liability company; CENTREPOINTE DEVELOPMENT, LLC, an Arizona limited liability company; CENTREPOINTE HOLDINGS, LLC, an Arizona limited liability company; CENTREPOINTE DEVELOPMENT - LANESBOROUGH ASSET MANAGEMENT INVESTMENT FUND LIMITED PARTNERSHIP, a Delaware limited partnership; CENTREPOINTE DEVELOPMENT OPPORTUNITY FUND LIMITED PARTNERSHIP, an Arizona limited partnership; CENTREPOINTE DEVELOPMENT - CARTER EVANS INVESTMENT FUND LIMITED PARTNERSHIP, a Delaware limited partnership; RNFI UNLIMITED LLC, a Delaware limited liability company; RNFI UNLIMITED LLC, an Arizona limited liability company, <br><br> Debtors. | Case No. 2-12-bk-01288-GBN <br><br> JOINTLY ADMINISTERED WITH: <br><br> 2-12-bk-01446 <br> 2-12-bk-01448 <br> 2-12-bk-01449 <br> 2-12-bk-01452 <br> 2-12-bk-01622 <br> 2-12-bk-01624 <br> 2-12-bk-01627 <br> 2-12-bk-01648 <br> 2-12-bk-01649 <br><br> **DEBTORS' INITIAL RESPONSE TO MOTION TO APPOINT A CHAPTER 11 TRUSTEE OR EXAMINER** <br><br> DATE: March 23, 2012 <br> TIME: 9:00 a.m. <br> LOCATION: 230 North First Avenue <br> Phoenix, Arizona <br> Courtroom 702, 7th Floor |
| THIS FILING APPLIES TO: <br><br> __X__ All Debtors <br><br> ____ Specified Debtors | |

00218519.11

The above-captioned debtors ("**Debtors**") file this initial Response to the *Motion to Appoint a Chapter 11 Trustee or Examiner Pursuant to 11 U.S.C. §§ 105 and 1104* (the "**Motion**") [DE 65] filed by the United States Trustee ("**UST**"). So that the Court may be fully apprised of the complete record before it reaches a final decision on the Motion, the Debtors respectfully request that an evidentiary hearing be held pursuant to Local Bankruptcy Rule 9014-2(b). This Response is supported by:

(i) The original declaration of Ron Frandsen ("**Frandsen**") [DE 12].

(ii) The *Response in Support of Motion to Sell Personal Property and Motion to Confirm Authority of Chief Restructuring Officer* (the "**Response**") [DE 78];

(iii) The concurrently filed declaration of Timothy Shaffer (the "**Shaffer Declaration**");

(iv) The concurrently filed supplemental declaration of Frandsen (the "**Supplemental Declaration**");

(v) The concurrently filed *Debtors' Controverting Statement of Facts in Support of their Opposition to Motion for Appointment of a Chapter 11 Trustee or Examiner*;

(vi) The attached Memorandum of Points and Authorities; and

(vii) The entire relevant record in this case.

DATED this 22nd day of March, 2012.

    SCHIAN WALKER, P.L.C.

    By /s/ SCOTT R. GOLDBERG, #015082
        Scott R. Goldberg
        Cody J. Jess
        Attorneys for the Debtors

///
///
///
///
///

# MEMORANDUM OF POINTS AND AUTHORITIES

## I. DEBTOR'S SEPARATE STATEMENT OF FACTS[1]

### Background Facts

1. Formed in or about 2006, the Debtors were part of common enterprise herein referred to as "**CentrePointe**." The investors ("**Investors**") in CentrePointe were located in the United Kingdom who desired to invest in commercial real estate projects (the "**Projects**") in Arizona. Through the summer of 2010, Jeffrey Tiller ("**Tiller**") directed and controlled the business activities of the enterprise. Original Declaration at ¶¶ 6-8, 12, 14.

2. The Investors' funds were solicited pursuant to private placement memoranda and other documents (the "**Investor Agreements**") that formed the agreements between the Investors and four funds that would receive and manage the investments. Supplemental Declaration at ¶ 8.

3. The four funds were as follows: (1) CentrePointe Development – Global Vision Investment Fund Limited Partnership; (2) CentrePointe Development Opportunity Fund Limited Partnership; (3) CentrePointe Development – Carter Evans Investment Fund Limited Partnership; and (4) CentrePointe Development – Lanesborough Asset Management Investment Fund Limited Partnership (collectively, the "**Fund Debtors**"). Original or Supplemental Declaration at ¶ 7.

4. The Fund Debtors were formed as limited partnerships so that each of them was managed by a general partner. The general partner of the Funds was CentrePointe Development Investment Fund GP, LLC ("**CPD GP**") or CentrePointe Development, LLC ("**CPD**"). CPD GP was managed by CPD. It appears that CentrePointe Holdings, LLC was the sole member and manager of CPD and vice versa. Shaffer Declaration at ¶ 8.

5. In total, the Fund Debtors received about $32 million from the Investors, who were intended to be the limited partners (and thus equity holders) of the Fund Debtors. The money raised by

---

[1] The statement of facts set forth in the Response are incorporated herein by this reference. All exhibits attached to the Response are also incorporated herein by this reference.

-3-

the Fund Debtors appears to have been commingled and disbursed in three directions. First to the Projects, second to about 70 or so limited liability companies and the assets they acquired (the "**Media Assets**"), and third to Tiller for his own recreational uses. Shaffer Declaration at ¶¶ 9 and 10. Initially, the Media Assets were owned by an entity called Uniq Auto Salon, LLC ("**Uniq**"). Supplemental Declaration at ¶ 10.

6. It does not appear that the investments and purchases that the Fund Debtors made can be traced to monies received from any particular Fund Debtor or to any particular Investor. Instead, it appears that the Fund Debtors acted as a single fund that held and disbursed commingled funds to develop the Projects and to purchase and develop the Media Assets. This has led the Debtors to conclude that substantive consolidation of the Debtors' estates is an appropriate remedy under these circumstances. Shaffer Declaration at ¶ 10.

7. In 2010, just as the Projects were in varying degrees of foreclosure, Tiller decided to abandon CentrePointe. He then discussed transferring control of the Fund Debtors, the Projects, and the Media Assets to Frandsen, who had been hired in 2008 to manage the Projects. Original o Declaration at ¶ 15.

8. Portcullis Development, LLC ("**Portcullis**") is a debtor entity that Frandsen formed to enter into the Portcullis Agreement (as defined below). The managing member of Portcullis is another debtor, RNFI Unlimited, LLC (Delaware) ("**RNFI Delaware**"), which Frandsen also owns and controls. Supplemental Declaration at ¶ 15.

9. The transfer of control of the Fund Debtors and the Projects occurred through an asset purchase agreement between CPD as seller (as set forth above, CPD controlled the Fund Debtors) and Portcullis as buyer (the "**Portcullis Agreement**"). *See* DE 86, and Exhibit "A5" thereto. As part of the Portcullis Agreement, Portcullis assumed all of the liabilities that CPD had to the Fund Debtors and hence to the Investors. No purchase money was exchanged pursuant to the Portcullis Agreement. Supplemental Declaration at ¶¶ 6 and 15.

10. Frandsen gained control of the Media Assets pursuant to an asset purchase agreement between Hyde Park, LLC ("**Hyde Park**") as seller and RNFI Unlimited, LLC (Arizona) ("**RNFI Arizona**") as buyer (the "**Hyde Park Agreement**"). *See* DE 84. Hyde Park controlled Uniq, which was the parent company to substantially all of the limited liability media companies. Pursuant to the Hyde Park Agreement, RNFI Arizona acquired virtually all of the Media Assets but also assumed liabilities owed to the Investors. Again, no purchase money changed hands in this transaction. Supplemental Declaration at ¶ 6.[2]

11. The purposes of the Portcullis Agreement and the Hyde Park Agreement were twofold. First, to place the assets under Frandsen's control, and second to ensure that the liabilities owed to the Investors would continue to follow the assets that were likely purchased from the monies that the Investors had delivered to the Fund Debtors. Supplemental Declaration at ¶ 6.

12. Because the Projects were foreclosed upon, the only debtor that owns and controls assets is RNFI Arizona. Upon information and belief, these assets were acquired with the monies that the Investors contributed to the Fund Debtors. Accordingly, the Debtors believe that the Fund Debtors directly, and the Investors indirectly, have claims to or against these assets. Supplemental Declaration at ¶ 10.

13. In December 2011, Frandsen decided that independent management should be retained to recover and maximize assets. As a result, RNFI Arizona retained Clotho Corporate Recovery, LLC to act as its Chief Restructuring Officer ("**CRO**"). As set forth above, RNFI Arizona acquired the Media Assets under the Hyde Park Agreement, and there is no dispute that Frandsen is the sole member and manager of RNFI Arizona. Supplemental Declaration at ¶ 6. Neither the CRO nor Shaffer has any past

---

[2] The relationship among RNFI Arizona, RNFI Delaware and Portcullis requires an explanation. Frandsen formed Portcullis to, among other things, acquire all of CPD's interests. He also formed RNFI Delaware at or about the same time to acquire the Media Assets. However, the Hyde Park Agreement mistakenly listed RNFI Arizona as the buyer. By the time Frandsen discovered this mistake, that agreement could not be amended because Tiller had left the country. Frandsen did the next best thing by forming RNFI Arizona. Hence, RNFI Delaware was the intended buyer under the Hyde Park Agreement and RNFI Arizona was actually formed after that agreement was executed.

-5-

or present connection to Frandsen, the Debtors, or to Tiller. Shaffer Declaration at ¶ 5.

**The Bankruptcy Cases**

14. On January 24, 26, and 30, 2012, the Debtors filed Chapter 11 bankruptcy petitions in this Court. The Debtors' bankruptcy cases are being jointly administered. The Debtors have filed all of their bankruptcy statements and schedules. The primary creditors in these cases are the Investors, who, as stated, were intended to be the limited partners of the Fund Debtors. Pursuant to the interim order limiting notice [DE 17], all of the Investors have been sent notices of these bankruptcy proceedings. No creditors committee or equity committee has been appointed in this case.

15. On March 9, 2012, the UST filed the Motion seeking the appointment of a Chapter 11 trustee or examiner. The Motion contends that: (a) there was a lack of corporate authority to file and pursue these cases; (b) there are conflicts of interest between and among Frandsen, the Debtors, and Debtor's counsel; (c) gross mismanagement of the Debtors is continuing; and (d) there is a need for a fraud examiner and special counsel. The Debtors respectfully disagree.

**The Authority to File the Bankruptcy Petitions was Valid**

16. Pursuant to the Hyde Park Agreement, RNFI Arizona controls the Media Assets. Irrefutably, Frandsen owns and controls RNFI Arizona. In addition, there is no question that Frandsen, as the sole member and manager of RNFI Arizona, had the authority to delegate his authority to the CRO. Accordingly, there is no doubt that RNFI Arizona had the authority to seek bankruptcy relief in this Court, and that the CRO has the authority to act for RNFI Arizona in this case. Because RNFI Arizona also assumed about $17 million in liabilities owed to Investors, the Investors are the "creditors" in the RNFI Arizona bankruptcy case.

17. Furthermore, it is very apparent that the Debtors acted as a single economic unit commingling their assets and liabilities in the Projects and the Media Assets. Accordingly, the right to seek bankruptcy protection for one entity should extend to the other entities as well since they appear to be one and same entity. Equity principles require this result. As noted, RNFI Arizona, which was

properly filed, holds the assets that rightfully should be distributed to the Fund Debtors and their Investors. But since those assets cannot be segregated by Fund Debtor or by Investor, it is imperative that the jurisdiction of this Court be asserted to ensure that a fair and equitable distribution of those assets takes place. Likewise, the assertion of jurisdiction ensures that no Investor gains an advantage over any other Investor by receiving a priority distribution or by other means.

18. The substantive consolidation of all of the other Debtors into the RNFI Arizona case should resolve all authority issues. This Court has the authority to order the substantive consolidation of both debtor and non-debtor entities into a bankruptcy case pending before it. *In re Bonham*, 229 F.3d 750 (9th Cir. 2003). Accordingly, the limited resources that remain should not be spent determining issues of authority if the other entities, whether as debtors or as dismissed non-debtors, can be substantively consolidated into the RNFI Arizona bankruptcy case, which, as shown above, was properly filed in this Court.

19. Even in the absence of substantive consolidation, there is considerable support in the corporate records that the Debtors' bankruptcy cases were properly filed. Exhibit "A5" to the Portcullis Agreement contains a schedule of those assets that were transferred to Portcullis. Those assets include CPD's interests in the "Funds," the "Managers", and "Holdings."[3] Furthermore, Tiller exercised actual control of CentrePointe until he abandoned it in 2010 when the keys were turned over to Frandsen. Thus, even if there is some gap in the corporate records, which should not be surprising, Frandsen had actual and exercised authority over the Debtors from 2010 forward. Whether by or through substantive consolidation, corporate authority and/or actual authority, these cases were properly commenced in this Court.

20. In considering the Motion, it is worth noting that if Frandsen lacked the authority to file the bankruptcy petitions, then jurisdiction does not exist to appoint a trustee or an examiner either; and

---

[3] The inclusion of Holdings among the transferred assets is important because it breaks the ownership and control loop as between CPD and Holdings.

the Court's only alternative is to dismiss the cases (except for RNFI Arizona and RNFI Delaware). *In re Oasis at Wild Horse Ranch, LLC*, BAP AZ-11-1142-DKIMY, 2011 WL 4502102 (B.A.P. 9th Cir. Aug. 26, 2011) (quoting *In re Real Homes, LLC,* 352 B.R. 221, 225 (Bankr. D. Id. 2005) (dismissal is the remedy for an authorized filing)). Dismissal, however, would have only negative consequences as legal claims could be lost, and Investors will continue to seek advantages over other Investors in attempts to recover upon their claims or interests. The inevitable race to the court-house is certain to ensue.

21. At the end of the day, the Debtors believe and recognize that the Investors' wishes should be given paramount consideration. Whatever objectives that the CRO, Frandsen and the UST may hold, the appointment of an unsecured creditors committee is the single most important event that could occur in these cases to advance and speed their resolution in a fair and equitable manner. As such, it is respectfully submitted that absent exigent circumstances, a committee should be appointed before any evidentiary hearing on the Motion is conducted.

### **There are no Present Conflicts of Interest**

22. The Motion alleges that conflicts of interest exist because some or all of the Debtors have claims against each other. Given the commingling that occurred, prudence required that all potential inter-debtor claims and all potential co-debtor claims be scheduled. Moreover, the Fund Debtors appear to have conducted business as a single fund or as a single economic unit. Therefore, out of an abundance of caution, each Fund Debtor may be obligated to all of the Investors, and thus all the Investors were listed as creditors of each of the Fund Debtors. In addition, the assets of the Fund Debtors appear to have been hopelessly commingled when they were spent on the Projects and on the Media Assets. Accordingly, all the Investors were scheduled as creditors of RNFI Arizona, which, again, is the only debtor entity with assets that can be traced to the Fund Debtors and thus to the Investors.

23. For the reasons set forth above, substantive consolidation should be pursued. If it is pursued and approved, then all of the conflicts that the UST describes will be eliminated. In that event,

Case 2:12-bk-01288-GBN   Doc 94   Filed 03/22/12   Entered 03/22/12 18:52:58   Desc
Main Document    Page 8 of 18

one set of schedules is all that would be required. Regardless, the answer to the UST's concerns does not lie in the appointment of a trustee or examiner because any such person would suffer the very same conflicts that the UST now claims to exist. Instead, assuming jurisdiction exists (although the UST contends it does not), to remedy the ills that the UST complains about a trustee or an examiner would need to be appointed for <u>each</u> of the Debtors' cases. Obviously, this "solution" is no solution at all. The only legitimate solution is to substantively consolidate the cases, and to appoint an unsecured creditors committee to ensure that the interests of the Investors are safeguarded, and to permit the CRO who has already made substantial progress to continue to manage the estates. The appointment of an interim trustee who could potentially be removed if an election is held is unnecessary, and would be duplicative, dilatory and wasteful.

### **The Debtors' Estates are Being Properly Managed**

24. The Motion contends that the acts of gross mismanagement are continuing to the detriment of creditors. Respectfully, the Motion is devoid of a single example of any misconduct, misdeed, or misadventure that has occurred since these cases were filed. If the UST is aware of any post-petition misconduct, then it should clearly set forth all of the facts and circumstances related to that conduct. In the absence of any such example, the Court can and should conclude that the CRO has properly managed the Debtors since their bankruptcy filing date.

25. Instead of pointing to any post-petition misconduct, the Motion implies that Frandsen has engaged in two potentially bad acts, both of which occurred pre-bankruptcy. The first act is that Frandsen is alleged to have recorded a UCC-1 Financing Statement. It is difficult to fathom why this act should be deemed suspicious when it appears that Frandsen was simply attempting to protect the Debtors' assets by perfecting a security interest that had been previously granted. Nevertheless, the CRO is fully investigating this issue and intends to report on it as soon as his investigation is complete.

26. The second example concerns the sale of a single family residence. With respect thereto, this property was subject to an asset purchase agreement in which liabilities to the Investors were also

-9-
Case 2:12-bk-01288-GBN    Doc 94    Filed 03/22/12    Entered 03/22/12 18:52:58    Desc
Main Document    Page 9 of 18

assumed. Frandsen then transferred the property to himself for the purpose of obtaining a $425,000 loan that was deposited into a company bank account and used to pay the Debtors' bills. Then, in an arms-length sale, the property was sold and the net proceeds deposited into a debtor-in-possession account. Frandsen appears not to have benefitted from this transaction. The CRO is fully aware of this transaction as well, and intends to report on it when his investigation is complete.

27. In summary, the UST cannot point to a single bad act that occurred post-bankruptcy or to a single bad act that occurred pre-bankruptcy that was committed by any person that is in a position to influence the Debtors' bankruptcy cases.

## II.  LEGAL ANALYSIS

### The Appointment of a Trustee is Not Warranted

28. It is widely recognized that the appointment of a chapter 11 trustee is an extraordinary remedy. *In re The 1031 Tax Group, LLC*, 374 B.R. 78, 85-86 (Bankr. S.D.N.Y. 2007); *In re Sharon Steel Corp.*, 871 F.2d 1217, 1225 (3rd Cir. 1989). The party seeking appointment of a chapter 11 trustee has the burden of showing by clear and convincing evidence "cause" under § 1104(a)(1). *1031 Tax Group*, 374 B.R. at 85-86; *In re Adelphia Commc'ns Corp.*, 336 B.R. 610, 656 (Bankr. S.D.N.Y. 2006).

29. The bankruptcy court has wide discretion in considering which facts may or may not be relevant in determining whether a trustee should be appointed. *1031 Tax Group*, 374 B.R. at 85-86; *Sharon Steel Corp.,* 871 F.2d at 1226; *Adelphia,* 336 B.R. at 656 ("[t]he decision to appoint a chapter 11 trustee is a factual determination entrusted to the discretion of the bankruptcy judge."). Bankruptcy courts are well aware that not all acts, including fraud, rise to the level of "cause" mandating the appointment of a trustee:

> Although the word 'shall' in § 1104(a) circumscribes the court's discretion, the concepts of incompetence, dishonesty, gross mismanagement and even fraud all cover a wide spectrum of conduct. While under § 1104(a)(1) the court is not directly called upon to weigh the costs and benefits of appointing a trustee, it nevertheless cannot ignore competing benefit ***and harm*** that such an appointment may place upon the estate. Implicit in a finding of incompetence, dishonesty, etc., for purposes of § 1104(a)(1), is

whether the conduct shown rises to a level sufficient to warrant the appointment of a trustee . . .

As one court observed, 'one would expect to find some degree of incompetence or mismanagement in most businesses which have been forced to seek the protections of chapter 11.' In view of the court's uncircumscribed power to terminate the appointment of a trustee under § 1105, it would be illogical to think that upon a showing that management had been slightly incompetent or dishonest on one occasion, despite the fact that the appointment of a trustee would be harmful to everyone involved, the court would have to first appoint a trustee, and immediately thereafter could grant a motion to terminate that appointment.

*In re General Oil Distributors*, 42 B.R. 409 (Bankr. E.D.N.Y. 1984).

30. As bankruptcy courts recognize, "[w]hen considering whether to appoint a trustee for cause under § 1104(a)(1), the focus is on ***the debtor's current management, not the misdeeds of past management***." *1031 Tax Group*, 374 B.R. at 86; *In re Sletteland*, 260 B.R. 657, 672 (Bankr. S.D.N.Y. 2001) ("[O]n a motion for the appointment of a trustee, the focus is on the debtor's current activities, not past misconduct."). *See also* 7 COLLIER ON BANKRUPTCY ¶ 1104.02[3][c][i] (15th ed.).

In other words, the fact that the debtor's prior management might have been guilty of fraud, dishonesty, incompetence, or gross mismanagement does not necessarily provide grounds for the appointment of a trustee under § 1104(a)(1), as long as a court is satisfied that the current management is free from the taint of prior management.

*1031 Tax Group*, 374 B.R. at 86 (citing *In re Microwave Products of America,* 102 B.R. 666, 671 (Bankr. W.D. Tenn. 1989)). That the focus is on the current management is also supported by § 1104(e), which provides in pertinent part:

The United States trustee shall move for the appointment of a trustee under subsection (a) if there are reasonable grounds to suspect that **current** members of the governing body of the debtor, the debtor's chief executive or chief financial officer, or the members of the governing body who selected the debtor's chief executive or chief financial officer, participated in actual fraud, dishonesty, or criminal conduct in the management of the debtor.

(Emphasis added). Section 1104(e) gives the UST "an important but ill-defined role requiring vigilance and action where fraud, dishonesty, or criminal conduct by ***'current members'*** of management is suspected." *1031 Tax Group*, 374 B.R. at 87 (emphasis added). Subsection (e) unquestionably makes

clear that whether cause for the appointment of a trustee exists depends on whether current management was or is culpable for the type of conduct described in § 1104(a)(1).

31. Here, the UST has failed to demonstrate that any post-bankruptcy misconduct has occurred. Nor will the UST be able to do so since the Debtors have conducted their business affairs in a manner that is entirely consistent with their fiduciary duties. The Debtors acknowledge that certain bad acts may have occurred when Tiller was in control, but it is clear that Tiller is no longer in control. Knowing this, the UST has attempted through innuendo to link Tiller and his bad acts to Frandsen, but Frandsen is not in control either. Instead, the CRO controls the Debtors, and the CRO is entirely independent of Tiller, Frandsen, or of any member of the Debtors' former management team.

32. The UST also seeks the appointment of a trustee pursuant to § 1104(a)(2) as being in the best interests of creditors because of the alleged conflicts of interest between and among the Debtors, Frandsen and the Debtors' counsel, all of which is based upon the claims that the Debtors may have against each other. The UST's position on this issue is mistaken from a legal and practical perspective. In a comprehensive opinion arising out of the *Adelphia* bankruptcy case, Judge Gerber surveyed fifteen multi-debtor Chapter 11 cases where inter-debtor claims were common. In all but one instance, no trustee was appointed.

33. As such, Judge Gerber concluded that while inter-debtor disputes are common in multi-debtor chapter 11 cases, the appointment of chapter 11 trustees to deal with them is not. *In re Adelphia Commc'ns Corp.*, 336 B.R. 610, 644 (Bankr. S.D.N.Y. 2006), *aff'd*, 342 B.R. 122 (Bankr. S.D.N.Y. 2006). In denying motions to appoint Chapter 11 trustees, Judge Gerber held:

> [I]t is quite clear, in this Court's view, under the Bankruptcy Code and the case law, that there is no requirement of law, nor should there be one, that says that any time interdebtor disputes exist in a multi-debtor chapter 11 case, and a creditor constituency is upset that it may not be paid in full, independent fiduciaries (of any kind) must be appointed for any or all of the individual debtors so affected. The imposition of any such requirement

-12-

would represent a sea change in the law and in chapter 11 practice, with a highly destructive effect on the manner in which multi-debtor chapter 11 cases are run. As importantly or more so, any such rule would in nearly all, if not all, such cases have a material adverse effect on creditor recoveries.

Under the Code and the relevant case-law, in this Court's view, the existence of interdebtor disputes, even material ones, is not by itself cause for the appointment of a trustee or (assuming one might be permissible) a nonstatutory fiduciary. The existence of such disputes must instead be considered as one of many factors – including, most significantly, the advantages and disadvantages to affected creditors that would result from the desired appointment; the existence of less damaging alternatives; and the extent to which the alternatives would address legitimate needs and concerns with fairness, due process and appropriate advocacy.

*Id.* at 619.

34. The court's discretion as to whether the appointment of a trustee is appropriate under § 1104(a)(2) is broad, and may include the consideration of many factors. *In re Sundale, Ltd.*, 400 B.R. 890, 901 (Bankr. S.D. Fla. 2009); *In re V. Savino Oil & Heating Co.*, 99 B.R. 518, 525 (Bankr. E.D.N.Y. 1989). Here, the factor that the UST relies upon is the potential for inter-debtor claims and the resulting conflicts of interest that may arise in the future. However, the remedy that the UST implicitly seeks is far worse than any future conflict.

35. To avoid the conflicts that the UST claims to exist, each of the conflicted Debtors would require their own trustee or examiner. The administrative burden this would place on their respective estates would be enormous. Following this path would cause substantial harm to the very creditors that the UST is attempting to protect. Furthermore, as set forth above, it is likely that these cases can and should be substantively consolidated. Substantive consolidation would eliminate the possibility that conflicts could arise in the future, and thus would eliminate the grounds for the appointment of a trustee under § 1104(a)(2).

36. It is also worth repeating that the appointment of a trustee under § 1104(a)(2) is determined based upon the best interests of creditors. Yet the UST has sought this extreme remedy without the benefit of receiving input from a committee. Respectfully, the UST is not in the position to inform the Court about the preferences of the Investors, at least not yet. While it does seems obvious, in

-13-

the absence of an emergency, § 1104(a)(2) seems to contemplate that creditors should participate in any decision to appoint a trustee under this section. Here, however, it seems as though the creditors are being excluded from the decision making process. Indeed it is the UST that is proceeding without input from a committee. The absence of committee input means that this Court will be denied a complete record before issuing its ruling.

## **The Bankruptcy Code does not Require the Appointment of an Examiner**

37.  The UST argues that pursuant to 11 U.S.C. § 1104(c)(2), the Court ***must*** appoint an examiner in this case. The UST argues that the Court has no choice but to appoint an examiner under this section because, among other things, the Debtors appear to have unsecured, liquidated, non-contingent, and undisputed claims in excess of $5 million. The UST is very much mistaken.

38.  Here, the creditors in this case are the Investors who are the limited partners in the Fund Debtors. As such, the legal claims that the Investors possess arise from their limited partnership interests, and thus derive from their equity stake in the Fund Debtors. The Investors were only scheduled as unsecured creditors because the time and expense was not taken to convert their dollar investments (and the payments they received) into partnership units. To the extent that the Investors have claims, those claims are likely to be equitable in nature, and certainly will not meet the requirement that the claims be liquidated, non-contingent, and undisputed. It is very likely that Investors will contest the claims of other Investors as is typical in cases where Ponzi-like practices may have occurred.

39.  But even if all the requirements of the statute were met, the Court is not compelled to appoint an examiner. For example, Judge Kevin J. Carey of the United States Bankruptcy Court for the District of Delaware held that the appointment of an examiner was not warranted under § 1104(c)(2) even though the factors delineated in that section were met. *In re Spansion, Inc.*, 426 B.R. 114 (Bankr. D. Del. 2010), *appeal dismissed*, CIV. 10-369 RBK, 2011 WL 3420441 (D. Del. Aug. 4, 2011).

40.  In *Spansion*, two *ad hoc* committees attempted to have an examiner appointed. In denying this request, Judge Carey concluded that a bankruptcy court has considerable discretion in

designing an examiner's role, and thus could appoint an examiner without assigning him any tasks or responsibilities. As Judge Carey wisely noted, "[t]he statute requires appointment of an examiner 'to conduct an investigation of the debtor *as is appropriate*' if the debtor's unsecured debts exceed $5 million." *Id*. (citing COLLIER ON BANKRUPTCY ¶ 1104.03[2]) (emphasis in original). There is no sound purpose in appointing an examiner "only to significantly limit the examiner's role when there exists insufficient basis for an investigation." *In re Spansion*, 426 B.R. at 127. To appoint an examiner with no meaningful duties "is a wasteful exercise, a result that could not have been intended by Congress." *Id.*

41. *In re Winston Indus., Inc. (In re Shelter Resources Corp.)*, 35 B.R. 304, 305 (Bankr. N.D. Ohio 1983) is another example of a case that demonstrates that the appointment of an examiner is not mandatory.

> No evidence has been offered to this Court indicating fraud, mismanagement or irregularities in the management of the debtor or the debtor-in-possession . . . It is the opinion of this Court, therefore, that confronted with the facts and circumstances that presently exist in this particular case, ***to slavishly and blindly follow the so-called mandatory dictates of Section** 1104(b)(2) [now, **§ 1104(c)(2)** ] **is needless, costly and non-productive and would impose a grave injustice on all parties herein.***

*Id*. (emphasis added). A similar view was expressed in *In re Erickson*, 2010 WL 881727 at *6, where the court stated:

> [T]his court, were there no standing/waiver problem on the part of the [movant], would be hard pressed to find any useful purposes for an examiner. Much like Judge Schmidt did in the case of *In re Asarco, LLC,* No. 05–21207, docket entry 7081 (Bankr. S.D. Tex. March 4, 2008), this court (in light of the mandate of Section 1104(c)) would . . . appoint an examiner with no duties, unless and until otherwise ordered by the court.

*Id*.

42. Collier on Bankruptcy recognizes that bankruptcy courts should not to blindly and slavishly adhere to the alleged mandatory requirements of § 1104(c)(2). Collier states that the provision "was not intended and should not be relied on to permit blatant interference with the chapter 11 case or

-15-
Case 2:12-bk-01288-GBN   Doc 94   Filed 03/22/12   Entered 03/22/12 18:52:58   Desc
Main Document    Page 15 of 18

the plan confirmation process." COLLIER ON BANKRUPTCY ¶ 1104.03[2] (2009). Collier on Bankruptcy further recognizes that the purpose of the statute indicates that it was to apply to public companies.

> Section 1104(c)(2) is the only remnant of the 'public company' exception contained in the original Senate bill, S. 2266. The Senate bill would have provided for the mandatory appointment of a trustee in 'public company' cases, which were defined as cases in which unsecured debt totalled [sic] at least $5,000,000 and there were not less than 1,000 security holders. The requirement that the court appoint an examiner if requested in any case where the specified debts exceed $5,000,000 was included in the Code as part of the compromise under which the 'public company' provisions were deleted.

COLLIER ON BANKRUPTCY ¶ 1104.03[2] (2009).

43. No useful purpose would be served by appointing one or more examiners in this case. Quite to the contrary, the appointment of an examiner and any professional that he or she may retain would simply burden the estates with additional administrative expenses. This unnecessary drain on the estates' limited resources is not in the best interests of the Investors, at least until a committee says otherwise.

44. Judge Gerber's decision in *Adelphia* in which he declined to appoint a trustee despite potential conflicts of interest between and among related debtors, refers to a memorandum decision rendered by Judge Gonzalez in the *World Com* bankruptcy case. In determining whether an independent fiduciary should be appointed, Judge Gonzales stated as follows:

> The appointment of a trustee would be very costly to the Debtors and their estates, with no apparent benefit. Given the size and complexity of the Debtors and their operations, the delay and expense that would be caused by the trustee's (and new professionals') need to learn about the Debtors' assets, liabilities, businesses, and chapter 11 cases would be substantial and would likely seriously and adversely affect the prospects of rehabilitation.

*Alephia*, 336 B.R. at 645-46 (citing *Memorandum Decision and Order Denying Motions for Appointment of a Chapter 11 Trustee and Examiner*, dated May 16, 2003, Bankr. S.D.N.Y. Docket No. 02–13533(AJG), ECF #5923 at 19).

45. Here, assuming that the debt threshold under § 1104(c)(2) is met (which it is not), the

Court should deny the UST's request for an examiner(s). The UST has not shown that any benefit would accrue by such an appointment. For example, the bankruptcy estates are already under independent control, and the UST has failed to point to any post-bankruptcy misconduct or favoritism toward any investor or third party. Moreover, substantive consolidation will eliminate all potential conflicts. While no benefit would be achieved, the cost of an examiner(s) to the estates would be substantial. For example, in the past few weeks, the CRO has made substantial progress. He has become familiar with the Debtors' books and records, its transactions, and has been communicating with many of the Investors. There is no legitimate reason to appoint an examiner to duplicate work that the CRO has already performed.

### III. CONCLUSION

46. Authority existed to file these bankruptcy cases. This is especially true of the RNFI Arizona bankruptcy case. Substantive consolidation resolves all authority issues, and all conflicts of interest issue that may exist now or in the future. Since no bad acts have occurred post-bankruptcy, and since the Debtors are already under independent control, a trustee is not necessary, and furthermore, the appointment of a trustee would not resolve the lack of authority and the conflicts that the UST is complaining about.

DATED this 22nd day of March, 2012.

SCHIAN WALKER, P.L.C.

By /s/ SCOTT R. GOLDBERG, #015082
    Scott R. Goldberg
    Cody J. Jess
    Attorneys for the Debtors

COPY of the foregoing e-mailed
this 22nd day of March, 2012, to:

Patty Chan, Esq.
U.S. Trustee's Office
230 North First Avenue, #204
Phoenix, Arizona 85003-1706
patty.chan@usdoj.gov

Alan A. Meda, Esq.
Stinson Morrison Hecker, LLP
1850 North Central Avenue, #2100
Phoenix, Arizona 85004-4584
Attorneys for Lanesborough Funds PPC;
Global Vision International Fund II;
Lawshare Nominees; Fidelis Management
ameda@stinson.com


/s/ JULIE LARSEN